UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-14073-CR-CANNON/MAYNARD

UNITED STATES OF AMERICA,

vs.

CATHERINE SHANNON DUNTON,

     Defendant.
_____/

### GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO THE DEFENDANT'S MOTION FOR DOWNWARD VARIANCE

  The United States of America, by and through the undersigned Assistant United States Attorney, hereby files this sentencing memorandum recommending that this Court sentence the defendant, Catherine Shannon Dunton, to a sentence within the guideline range as calculated in the Presentence Investigation Report (DE 25). In support thereof, the United States submits as follows:

**Procedural History**

  On December 8, 2022, a federal grand jury in the Southern District of Florida returned a single count Indictment charging the defendant with tampering with a consumer product, in violation of Title 18, United States Code, Section 1365(a)(4). (DE 1). The defendant entered a guilty plea to the Indictment on April 11, 2023. (DE 19). The defendant's sentencing hearing is scheduled for June 27, 2023.

  According to the Presentence Investigation Report ("PSI"), the defendant has a total offense level of 26 and a criminal history category of I, which yields an advisory guideline range of 63 to 78 months' imprisonment. (PSI at ¶¶ 28, 31, 102). The defendant's Base Offense Level pursuant to § 2N1.1(a) was 25. (PSI at ¶ 19).

The defendant qualified for a 2-level increase pursuant to § 3A1.1(b)(1) for putting vulnerable patients at risk by diluting or substituting the very medication administered to alleviate and control pain during the patient's surgical procedure. (PSI at ¶ 21). The defendant also received an additional 2-level increase pursuant to § 3B1.3 for abusing a position of trust since as a licensed nurse she was supposed to provide safe and competent care to her patients. Instead, she stole the very medication required during surgical procedures for her own use. (PSI at ¶ 22). This increased the defendant's offense level to 29 which after acceptance resulted in a Total Base Level of 26. (PSI at ¶¶ 24-28). Based upon a total offense lever of 26 and criminal history 1, the guideline imprisonment range is 63 to 78 months. (PSI at ¶ 102). Neither party filed objections to the PSI.

On June 21, 2023, the defendant filed a sentencing memorandum in support of a downward variance to a sentence of home confinement. Specifically, the defendant asks this Court to consider her lack of a history of violence, her stable residence, her compliance with the conditions of her pre-trial release, her ongoing cooperation with the U.S. Government and her need for treatment for her opioid addiction (DE 29).

## ANALYSIS

The overarching goal of a sentencing court is to fashion a sentence that is sufficient, but not greater than necessary, to accomplish the goals of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The sentencing court should begin the process by correctly calculating the applicable guideline range and must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). Section 1B1.1 of the Sentencing Guidelines outlines, in express language, the order which district courts are to proceed. First, the district court calculates the applicable guideline range. U.S.S.G. § 1B1.1(a). Second, the district court applies any applicable departures under Sections H and K of Chapter 5. U.S.S.G. § 1B1.1(b).

After the first two steps are complete, "the Court shall then consider the applicable factors in 18 U.S.C. § 3553(a) taken as a whole." U.S.S.G. § 1B1.1(c).

> The Section 3553(a) factors are:
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocations training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established in the Guidelines;
>
> (5) any pertinent policy statement by the Sentencing Commission;
>
> (6) the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1)-(7).

### Nature and Circumstances of the Offense

The essence of this case is that the defendant, a nurse, stole vials of fentanyl for personal use and refilled them with saline solution knowing that the adulterated substances would be administered to surgical patients. She began working at the clinic on September 20, 2021, as a circulating nurse. Her primary duties included interviewing patients, preparing patients for surgery, bringing patients to the procedure room, providing supplies and sterile instruments as needed during surgery, assisting other team members in monitoring the status of the patient and bringing the patient to the recovery room. Her duties also included retrieving controlled substances such as fentanyl from the RX room to be administered during surgical procedures as instructed by

3

the treating physician. She also delivered controlled substances to other staff members or administered controlled substances directly to the patient while under the doctor's supervision. The Clinic required staff to document the removal and use of any controlled substance on the controlled substance inventory log kept in the RX room which was monitored by a surveillance camera.

The defendant's tampering came to light on April 18, 2022, when during a routine morning-controlled substance inventory, Clinic staff discovered that one full box (25 vials) of Fentanyl Citrate was missing. A search for the missing fentanyl box ensued. During the search, staff reviewed the Clinic's external and internal surveillance footage, including the RX room where the key to the overstock cabinet was stored. During this timeframe, the keys to the overstock cabinet were secured by Clinic management. The overstock room was not fitted with a surveillance camera. At approximately 1:38 p.m., the missing fentanyl box (25 vials) was discovered by Clinic staff on the side of the locked overstock cabinet in the overstock room.

During the internal investigation, Clinic staff identified numerous boxes of fentanyl which appeared sealed, but upon closer inspection, had been opened from the rear. The plastic on the back of these boxes had been cut and appeared to have been accessed to remove the vials. A number of the vials bore dents on the crimps, the metal ring sealing the vials. During a review of some of the surveillance footage, Clinic staff observed the defendant opening the RX room's controlled substance cabinet removing and replacing vials of fentanyl without documenting the controlled substance log. Clinic staff then contacted the Food and Drug Administration's Office of Criminal Investigations (FDA) and reported their findings.

During the course of this investigation, the defendant's fingerprints were recovered from multiple tampered vials and boxes. An analysis of the sample tampered vials' clear liquid revealed that amounts of active pharmaceutical ingredients were miniscule and that the liquid was actually

a non-controlled liquid.  In addition, the defendant's hair sample submitted to the FDA lab tested positive for fentanyl.

The Clinic's surveillance footage from February 27, 2022 through April 20, 2022 captured the defendant pocketing and removing approximately 450 fentanyl vials in the RX room. Sometimes she would take products from the drawers where biostatic water and lidocaine products were stored.  Both of these products are clear liquids that resemble fentanyl.  On some of the surveillance footage, the defendant appeared to open the plastic at the rear of the fentanyl boxes. Once opened, she accessed the vials from the back of the box, returning the boxes to the controlled substance cabinet by placing the sliced openings to the back of the cabinet to avoid detection. Besides the April 15, 2022 fentanyl vial box, the defendant tampered and/or stole 6 other boxes of fentanyl on six separate occasions in March of 2022.

According to FDA Dr. Arthur Simone, an anesthesiologist, fentanyl injections are used to provide pain relief (analgesia) during and after surgery. Fentanyl is often used in conjunction with other medicines before or during an operation as part of the overall anesthesia plan. Without adequate anesthesia, and in particular analgesia, there is an increased risk of patient movement during the surgical procedure that could lead to injury such as unintended cutting of skin, muscle, nerves, or blood vessels. Inadequate pain control can also lead to an elevated risk of clinically significant increases in the patient's heart rate and blood pressure that can result in heart attack or stroke in vulnerable patients.  The vial tampering alone presented a risk of contamination of the fentanyl.  Any patient exposed to this contamination would be at risk of infection during or after the surgical procedure. In addition, and post-operatively, the patient's complaints of pain and their need for additional pain medication may have been minimized and inadequately treated by the recovery room staff based on the amount of fentanyl that the staff believed was administered prior to or during the procedure.

During her interview on May 11, 2022, the defendant admitted taking vials of fentanyl from the controlled substance cabinet. She described how she would take a vial's cap off, remove the entire dose of fentanyl, and replace the contents with saline. She then self-administered the fentanyl by injecting it around her wrist area. After removing the vial's cap, the defendant used a tool to recap the top of the vial. The tampered vial would be returned to the controlled substance cabinet in exchange for a new vial, repeating this process. She admitted to using saline and needles from the Clinic as part of the tampering process and self-administering the fentanyl. She self-administered fentanyl while at work and at home.

The defendant described the process of examining the vials to ensure removal of a new vial for personal use, instead of an already tampered vial. She recognized the tampered vials by the pry marks left on the vial's metal band. The defendant advised that these marks were left by the crimping tool when she recapped the vials. During the interview, the defendant led the agents to her bedroom where the crimping tool, syringes and saline solution were recovered.

As to the April 15-18, 2022 timeframe, the defendant admitted taking an entire box of fentanyl (containing 25 vials) from the overstock cabinet. She removed the box from the Clinic and over the course of the weekend self-administered all 25 vials replacing the contents as was her normal practice. When she returned to work on Monday April 18, 2022, she intended to return the tampered vials. After finding that the overstock cabinet keys were missing, she returned the box to the area of the cabinet surrounding the locked box. Dunton assumed the Clinic had noticed that fentanyl box was missing because the keys had been removed.

The defendant acknowledged that she worked as a circulating nurse, working in the operating rooms during surgeries. The surgeries included orthopedic, ophthalmology, ENT, and pain management. The defendant advised that she was aware that her actions caused patients to not receive their prescribed dose of fentanyl due to replacing the contents of the vials. The

6

defendant denied hearing any negative reporting or patients reporting higher levels of pain then expected at the facility.

### History and Characteristics of the Defendant

The defendant requests the Court grant a downward variance so that she can continue battling her addiction and remain gainfully employed. The government does not dispute that these are factors that the Court may consider. However, it is the defendant's very addiction that put patients at risk. If and when she resumes her nursing career, will additional patients be put at risk. Though this Court may consider the defendant's addiction and possible rehabilitation, the government submits that the defendant's documented history of addiction and treatment supports a sentence within the guideline range.

Florida's Board of Nursing's (hereinafter "the Board") public records confirm that on October 5, 2012, the Board issued a final order suspending the defendant's Nursing License until she underwent an evaluation by the Intervention Project for Nurses (IPN) and complied with any and all terms and conditions imposed by the IPN as a result of the evaluation. Attached to the order was the settlement agreement and the Administrative Complaint. The Complaint alleged that, while working as a Nurse at Lawnwood, the defendant tested positive for fentanyl pursuant to an employer requested drug test administered on March 4, 2012.

On August 23, 2022, Florida's State Surgeon General ordered an emergency restriction of the defendant's nursing license based on the evaluation and findings made by Dr. Lawrence Wilson, a physician specializing in addiction and psychiatry, during her IPN-facilitated evaluation conducted on May 24, 2022.[1] (Attachment 1: Florida State Surgeon General's August 23, 2022

---

[1] Dr. Wilson is Board Certified in Addiction Medicine and a Fellow of the American Society of Addiction Medicine. He is the Medical Director and CEO of 7 Summit Pathways Treatment and Recovery Center in Tampa. According to 7 Summit Pathways website, he is also a Physician Consultant to the Florida Department of Health.

Order). Based on Dr. Wilson's detailed findings in this publicly issued order, the defendant admitted that in 2008 while employed as a nurse at Lawnwood, she diverted Demerol, morphine, fentanyl, and Percocet for personal use. She also reported that in 2009 she had entered into a substance abuse IPN monitoring contract based on her imbibing one bottle of wine or 4-5 vodka drinks a day for 3-years of her contract with Lawnwood.

Dunton also admitted that in 2011, she had entered into another IPN substance contract while still employed at Lawnwood for diverting and consuming by injection, 50-1000 mcg of fentanyl as least three days a week as discussed above. According to the defendant, she completed her IPN Monitoring Contract in 2017.

According to Dr. Wilson, the defendant admitted to being an active alcoholic by advising that when she did not consume alcohol, she experienced withdrawal symptoms which included headaches and diarrhea. She also reported that between February and April of 2022, she began diverting fentanyl and morphine from the Clinic by removing the metal cap, removing the contents, and replacing the contents with saline. She admitted diverting fentanyl and morphine two-to-three times a week and experienced withdrawals on weekends. The defendant also admitted that she knew there were occasions where the patients would only receive the saline.

As detailed in the Order, the defendant, in conjunction with the evaluation, underwent toxicology testing. The defendant's PEth blood test was positive for prolonged or heavy "binge" alcohol consumption and her hair toxicology test was positive for fentanyl at 149 pg/mg with a cutoff of 25pg/mg. Based on his evaluation, Dr. Wilson diagnosed the defendant with severe opioid use disorder and severe alcohol use disorder. Based on his findings, Dr. Wilson found that the defendant was incapable of practicing nursing with reasonable skill and safety to patients. He recommended that the defendant undergo partial hospitalization or residential treatment with an

8

IPN-approved treatment provider. Since the defendant failed to comply with Dr. Wilson's recommendations as of August 23, 2022, the defendant's license was immediately suspended.

On May 10, 2023, the Board issued a final order finding that the defendant had been unable to practice nursing with reasonable skill and safety to patients by reason of illness or use of alcohol, drugs, narcotics, or chemicals or any other type of material or as a result of any mental or physical condition. (Attachment 2: Board's May 10, 2023 Final Order). The defendant's Nursing License was suspended until she undergoes an evaluation by the IPN and complies with any and all terms and conditions imposed by the IPN as a result of the evaluation. As in 2012, the defendant's license was suspended, but not revoked.

### Need to Protect the Public, Reflect the Seriousness of the Crime, Promote Respect for the Law, and to Provide Just Punishment

The government submits that the aggravating aspects of the defendant's offense and her history of addiction and failed rehabilitation warrants a guideline sentence. In *United States v. Beumel*, 522 Fed.App'x 623, 630 (11th Cir. 2013), Beumel "essentially stole fentanyl from patients on multiple occasions to feed his drug addiction, forcing those patients to endure extremely painful procedures without pain medication. Furthermore, after injecting himself with the stolen fentanyl, Beumel purposefully diverted the used syringes back to the patients. Although Beumel did not know he was infected with HCV at the time, he, as a health professional, must have known that reusing syringes in this way subjected the patients to a risk of potentially serious infection. Indeed, as a result of Beumel's conduct, five patients of the Mayo Clinic were infected with HCV, which caused these patients to endure prolonged physical and mental suffering. . ." The Eleventh Circuit affirmed Beumel's guideline sentence of 360 months' imprisonment finding that the district court properly determined that Beumel's actions reflected the seriousness of the offense, promoted respect for the law, provided just punishment, and deterred similar criminal conduct.

*Beumel* is instructive as the conduct, though much more sever, is similar in many respects as to those of the defendant.  The defendant also stole fentanyl from patients on multiple occasions to feed her drug addiction, she exposed patients to painful procedures without pain medication and exposed them to serious risk of infection by tampering with the sterile vials.   As a health professional and by her own admission, she knew she was subjecting some patients to such risk.  In addition, her actions could have seriously damaged the Clinic's reputation and might serve to erode public trust in medical institutions.

The defendant has been diagnosed with severe opioid use disorder and severe alcohol use disorder.  In 2009,  she began abusing alcohol because of stress and then began to use drugs after undergoing two surgical procedures.  Once her employer discovered that she was stealing pain medication, she reported herself to the IPN and entered into her first IPN contract which imposed a five-year monitoring period.  The defendant chose not to self-report her alcohol addiction which allowed her to consume alcohol while she was being monitored. (PSI at ¶ 54, 55).  She never completed the 2009 contract.

 In 2012, she tested positive for fentanyl in an employer-requested drug screen prompting her to self-report.  She again completed a six-week program followed by a six-month intense outpatient treatment with monitoring until 2017.  After the second violation, the defendant was fired from Lawnwood.

According to the defendant, in 2021, she was in an accident which caused her to relapse.  As a recovering addict, she could have reached out to the IPN when she realized that she was relapsing but chose not to.  Instead, she devised a scheme of stealing vials while on camera and off camera while working at the Clinic.  She injected herself with fentanyl and replaced the vials with saline solution.  She did this for a period of months.  Not only was she injecting herself with fentanyl, but was also abusing alcohol.  For the third time, she was exposing her patients to

10

undergoing surgery without the proper anesthesia and to possible infection. Only after she was caught, did she self-report. All of these factors show a far-reaching pattern of abuse of public and private trust.

Based on these factors, the government submits that this Court should impose a sentence with the guideline range to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense. Though the defendant's pattern of addiction has caused her to be fired, has led to the suspension of her license, she continued to tamper with vials of fentanyl for personal use. Only when caught, did she report and it appears that she will seek to reinstate her license.

The government submits that at this juncture a guideline sentence is needed to afford adequate deterrence to the defendant and to protect the public from further crimes of the defendant. A guideline sentence would also provide a safeguard to other providers who may also face difficult personal circumstances from making the same choice as the defendant. Other licensed providers facing similar personal challenges should know that if they use their specialized access to deprive patients of needed narcotics, they will go to prison for a substantial period of time. Such a message would serve to deter other medical professionals as well as protect their patients.

(INTENTIONALLY LEFT BLANK)

## CONCLUSION

Therefore, the United States respectfully requests that the Court sentence the defendant to a sentence within the advisory guideline range as properly calculated by U.S. Probation.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:     *s/Diana M. Acosta*
DIANA M. ACOSTA
Assistant United States Attorney
Florida Bar No. 775185
101 South US Highway 1, Suite 3100
Fort Pierce, Florida 34950
Telephone: 772-293-0981
Email: Diana.Acosta@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 23, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified.

*s/Diana M. Acosta*
DIANA M. ACOSTA
Assistant United States Attorney

## SERVICE LIST

**Diana M. Acosta, AUSA**
EMAIL: diana.acosta@usdoj.gov
101 S. U.S. Highway 1, Ste. 3100
Ft. Pierce, FL 34950
TEL: 772-293-0981
Attorney for Plaintiff U.S.A.
Method of Service: CM/ECF

**Frances Weisberg, USPO**
EMAIL: Frances_Weisberg@flsp.uscourts.gov
Flagler Center Building
501 South Flagler Drive, Suite 400
West Palm Beach, FL 33401
TEL: 561-804-6883
Method of Service: CM/ECF

**Michael R. Ohle, Esquire**
EMAIL: ohlelaw@aol.com
423 Delaware Avenue
Fort Pierce, Florida 34950
TEL:772-460-9801
Attorney for Defendant
Method of Service: CM/ECF